Filed 3/12/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| SIX4THREE, LLC,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>FACEBOOK, INC., et al.,<br><br>     Defendants and Respondents. | A166007, A167416<br><br>(San Mateo County<br>Super. Ct. No. CIV533328) |

     Plaintiff Six4Three, LLC (Six4Three) developed an application (app) called "Pikinis" that allowed users to search photos posted on Facebook of people in bathing suits. Six4Three sued Facebook, Inc. (Facebook) and six individuals,[1] alleging they had engaged in a "bait-and-switch" by initially providing developers with access to Facebook data, but later restricting that access.

---

[1] The individual defendants are Mark Zuckerberg, Christopher Cox, Javier Olivan, Samuel Lessin, Michael Vernal, and Ilya Sukhar.

1

In this consolidated appeal, Six4Three challenges the trial court's orders granting defendants' anti-SLAPP motions,[2] as well as its award of $683,417.50 in attorney fees to defendants as the prevailing parties on the anti-SLAPP motions.

Six4Three argues that the trial court (1) abused its discretion in considering Facebook's untimely anti-SLAPP motion; (2) erred in finding the commercial speech exception inapplicable; (3) erred in finding Six4Three had failed to carry its burden of showing a probability of prevailing on its claims; (4) erred in denying Six4Three's discovery motion; and (5) abused its discretion in awarding attorney fees for time billed outside of the anti-SLAPP motions. We disagree and affirm.

## BACKGROUND

We begin with a general overview of the factual and procedural background of this case. Additional background relevant to each of Six4Three's specific arguments is contained in the respective discussion sections, *post*.

### *This Action*

Six4Three filed an action against Facebook alone in April 2015. Instead of filing an anti-SLAPP motion, however, Facebook demurred to the complaint. Six4Three responded by filing an amended complaint adding a cause of action. Facebook again demurred, and the trial court sustained the demurrer with leave to amend. Six4Three filed a second amended complaint and

---

[2] Code of Civil Procedure section 425.16. All further statutory references are to the Code of Civil Procedure unless otherwise stated.

Facebook again demurred, but this time the trial court sustained the demurrer as to only one of the causes of action. The parties engaged in some initial discovery.

Six4Three then moved for leave to file a third amended complaint adding new causes of action and naming individual defendants. The trial court granted leave as to the new causes of action, but not the new defendants. Six4Three proceeded to file a third amended complaint, but also petitioned this court for a writ of mandate regarding the addition of individual defendants. Facebook demurred to the third amended complaint, which was sustained only as to some of the causes of action. Facebook moved for summary adjudication on limitation of damages, which was granted as to some causes of action.

### Fourth Amended Complaint

Six4Three filed its fourth amended complaint in November 2017. It asserted eight causes of action against Facebook: (1) violation of California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.); (2) breach of contract; (3) concealment; (4) intentional misrepresentation; (5) negligent misrepresentation; (6) intentional interference with contract; (7) intentional interference with prospective economic relations; and (8) negligent interference with prospective economic relations.

The fourth amended complaint alleged as follows: Facebook operates a social network that enables users to connect and share information with their friends and family. In 2007, Facebook launched "Facebook Platform," which made application

3

program interfaces (APIs) available for developers to build apps that used Facebook data. Facebook and its CEO Mark Zuckerberg made various statements regarding Facebook Platform related to developer integration with Facebook data and the opportunity for developers to build apps for Facebook users.

In 2010, Facebook introduced "Graph API," which "streamlined and formalized" developer access to Facebook data. Graph API permitted developers to build apps that could access Facebook data from not only users who downloaded the app, but also from those users' friends (unless their privacy settings were set to block such access).

In 2012, Six4Three developed Pikinis using image recognition technology to allow its users to search for photos posted on Facebook of people in bathing suits. Pikinis required use of Facebook's Graph API, as it enabled users to "reduce time" spent searching by "automatically finding" bathing suit photos accessible from friends through Facebook's network. According to Six4Three, it relied on representations made by Facebook and Zuckerberg about data access in building Pikinis. Six4Three also entered into Facebook's terms of service, titled "Statement of Rights and Responsibilities" (SRR).

Six4Three engaged contractors to develop a list of prospective customers, mostly students on college campuses. It also purchased advertising from Facebook to "test" various advertising campaigns. Six4Three conducted a "soft launch" or "trial period" for Pikinis, and ultimately received some paid subscriptions.

According to Six4Three, however, Facebook engaged in a "bait-and-switch" scheme by deciding to restrict access to Graph API data by "potentially competitive" apps in order to grow Facebook's business and advertising revenue.

In January 2015, Facebook sent an email to Six4Three stating that Facebook would be ending "third-party access to the full friends list and friends permissions," including access to friend photos. Six4Three alleged that Pikinis could not function without such access. In April 2015, Facebook restricted developer access to Graph API data, including photos data.

The fourth amended complaint sought damages, declaratory relief regarding Facebook's conduct, a permanent injunction prohibiting Facebook's interference with Six4Three's contracts or prospective economic relations, and a "permanent injunction requiring Facebook to restore Developer access to the Graph API data, including reading the full friends list, friends permissions and newsfeed APIs, and all other data and APIs available prior to Facebook's removal of the data on April 30, 2015."

### Facebook's Anti-SLAPP Motion

Facebook filed an anti-SLAPP motion to strike the fourth amended complaint. While this motion was pending, we issued a writ of mandate compelling the trial court to grant Six4Three leave to add the six individual defendants.

### Fifth Amended Complaint

The fifth amended complaint asserted seven causes of action against the individual defendants—the same claims

5

asserted against Facebook in the fourth amended complaint, except for the breach of contract claim. The fifth amended complaint also largely repeated the allegations of the fourth amended complaint, but added allegations regarding conspiracy by the individual defendants to direct and participate in Facebook's "bait-and-switch" scheme to restrict access to its Graph API data.

The individual defendants filed an anti-SLAPP motion to strike the fifth amended complaint.

## *Trial Court's Initial Rulings*

The trial court initially denied Facebook's anti-SLAPP motion as untimely, declining to exercise its discretion to consider the merits. But the trial court granted the individual defendants' anti-SLAPP motion, treating it as unopposed because Six4Three had incorporated by reference its briefs opposing Facebook's motion in violation of the 15-page limit under California Rules of Court, rule 3.1113, subdivision (d).

Facebook and Six4Three appealed.

## *Prior Appeal*

We affirmed in part but reversed in part, concluding the trial court acted within its discretion in declining to consider Facebook's untimely motion but abused its discretion in granting the individual defendants' motion based on Six4Three's violation of the page-limit rule. (*Six4Three, LLC v. Facebook, Inc.* (Sept. 30, 2019, A154890, A155334) [nonpub. opn.].)

We explicitly stated that if the trial court granted the individual defendants' anti-SLAPP motion on remand, it was not

6

precluded from reconsidering its denial of Facebook's motion. (*Six4Three, LLC v. Facebook, Inc.*, *supra*, A154890, A155334).)

### Trial Court's Subsequent Rulings

After remand, the trial court granted the individual defendants' anti-SLAPP motion and, upon reconsideration, granted Facebook's motion. It found that defendants had met their initial burden to demonstrate the causes of action arose from protected activity, and Six4Three had failed to sustain its ensuing burden to demonstrate a probability of prevailing on its claims. The trial court also denied Six4Three's motion for certain discovery under the anti-SLAPP statute.

Six4Three appealed the orders granting both anti-SLAPP motions.

### Attorney Fee Award

Defendants' anti-SLAPP motions requested an order awarding them attorney fees under section 425.16, subdivision (c) as the prevailing parties on the motions. The trial court awarded defendants $683,417.50 in attorney fees.

Six4Three appealed this order separately, but we granted its unopposed request to consolidate the appeals.

### DISCUSSION

The anti-SLAPP statute is "designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884.) Under the statute, a defendant may file a special motion to strike claims "arising from any act of that person in furtherance

7

of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) The motion "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." (*Id.*, subd. (f).)

Resolution of an anti-SLAPP motion requires the court to engage in the now familiar two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) If the court finds a showing has been made under the first step, "it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Ibid.*)

Six4Three presents five challenges to the trial court's rulings in this appeal. First, it argues that the trial court abused its discretion in considering Facebook's untimely anti-SLAPP motion. Second, Six4Three argues that the trial court erred on the first step of the anti-SLAPP analysis in finding inapplicable the commercial speech exception to protected activity. Third, it argues the trial court erred on the second step of the anti-SLAPP analysis in finding that Six4Three failed its burden to show a probability of prevailing on its claims. Fourth, it argues that the trial court erred in denying its motion for discovery under the anti-SLAPP statute. Fifth, Six4Three argues that the trial court abused its discretion in awarding attorney fees for time billed

8

outside of the anti-SLAPP motions. We address, and reject, each argument in turn.

## I. Consideration of Untimely Anti-SLAPP Motion

### A. Additional background

There is no dispute that Facebook's anti-SLAPP motion was filed after the statutory deadline. And, as detailed above, the trial court initially declined to consider the untimely motion.

In the prior appeal, we concluded that the trial court had not abused its discretion by denying the motion based on untimeliness. (*Six4Three, LLC v. Facebook, Inc.*, *supra*, A154890, A155334.) Facebook claimed it did not file anti-SLAPP motions to strike prior versions of the complaint because it had relied on former precedent permitting such motions whenever a complaint was amended, even if the causes of action were not new. (*Ibid.*) That precedent had been recently overturned by *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, but Facebook argued retroactive application of the new rule was unfair. (*Six4Three, LLC v. Facebook, Inc.*, *supra*, A154890, A155334.) We explained: "While it would have been within the trial court's discretion to rely on such considerations to hear Facebook's motion, the failure to do so was not an abuse of discretion." (*Ibid.*) We thus affirmed the denial of Facebook's anti-SLAPP motion, but reversed the ruling on the individual defendants' motion and remanded the matter. (*Ibid.*) In so doing, we stated: "In the event that the court grants the individual defendants' motion in whole or in part, we do not

9

preclude the court from reconsidering its order with respect to Facebook's motion." (*Ibid*.)

On remand, after the trial court found the individual defendants had met their burden to demonstrate protected activity and Six4Three had not sustained its burden of demonstrating a probability of prevailing on the merits of its claims, the trial court stated: "In light of the foregoing and in its discretion, the Court will reconsider, *sua sponte*, its order denying Defendant Facebook's Inc.'s Special Motion to Strike . . . and will set the matter for a hearing on the merits." It then quoted the statement in our opinion regarding reconsideration.

### B. Analysis

Section 425.16, subdivision (f) provides that an anti-SLAPP motion may be filed within 60 days of the complaint or, "in the court's discretion, at any later time upon terms it deems proper." We review the trial court's consideration of an untimely anti-SLAPP motion for abuse of discretion. (*Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 782 (*Platypus Wear*).) Here, Six4Three argues that the trial court abused its discretion in two respects.

First, Six4Three contends that the trial court "offered **no explanation at all**" for its decision. The record refutes this contention. In granting the individual defendants' anti-SLAPP motion, the trial court made clear why it was exercising its discretion to address Facebook's motion on the merits: it found the individual defendants had met their threshold burden as to protected activity and that Six4Three failed its subsequent

10

burden to establish the merits of its claims. These determinations were plainly relevant to Facebook's motion, as Six4Three asserted many of the same allegations and seven of the eight causes of action against the individual defendants that it asserted against Facebook. The trial court also quoted the statement from our opinion that it would not be precluded from reconsideration of Facebook's motion if it granted the individual defendants' motion. The " 'grounds given by the court' " for considering Facebook's motion are thus clear from the record. (*Platypus Wear*, *supra*, 166 Cal.App.4th at p. 787, quoting *Olsen v. Harbison* (2005) 134 Cal.App.4th 278, 285; see also *W.L. Gore v. Intern. Medical Prosthetics Research* (Fed.Cir. 1992) 975 F.2d 858, 865 [no abuse of discretion for failure to make explicit findings where the "posture of the case and the factors justifying entry of judgment are apparent from the materials before us"].)

Second, Six4Three relies on *Platypus Wear* to argue that the trial court exceeded the bounds of its discretion because Facebook filed its anti-SLAPP motion years after the action was filed, and after Facebook elected to respond to the original and amended complaints by demurrers and a motion for summary adjudication. *Platypus Wear* is distinguishable on its facts.

In that case, the plaintiff filed a complaint in 2004 and the defendant answered the complaint two months later. (*Platypus Wear*, *supra*, 166 Cal.App.4th at p. 776.) The matter proceeded and in late 2006, the trial court set discovery cut-off and trial dates. (*Id.* at p. 777.) The parties completed a "substantial amount" of discovery. (*Id.* at p. 784.) Three months

11

before the trial date, the defendant filed an ex parte application to allow him to file an anti-SLAPP motion and continue the trial. (*Id*. at p. 777.) *Platypus Wear* held that the trial court abused its discretion in granting the application. (*Id*. at p. 780.) It explained that, because the discovery cut-off date had already passed and trial was scheduled to begin a week after the hearing on the anti-SLAPP motion, "one of the basic purposes of the anti-SLAPP statute—to allow for the prompt resolution of disputes before significant pretrial discovery expenses are incurred—could not be met in this case." (*Id*. at p. 784.)

Here, unlike *Platypus Wear*, Facebook did not file its motion after the discovery cut-off or on the cusp of trial. More importantly, the trial court exercised its discretion to consider Facebook's untimely motion after it had granted the individual defendants' timely motion based on largely the same allegations and same causes of action. That decision served "both judicial economy and the public policy behind the anti-SLAPP statute." (*Platypus Wear*, *supra*, 166 Cal.App.4th at p. 784.)

Six4Three has thus failed to show the trial court abused its discretion in considering Facebook's untimely anti-SLAPP motion. We turn next to Six4Three's challenges to the anti-SLAPP rulings under the two-step framework outlined above.

## II. Anti-SLAPP First Step: Protected Activity

### A. Additional background

The first step of the anti-SLAPP analysis required defendants to demonstrate that the causes of action in the fourth and fifth amended complaints arose from activity protected by

the anti-SLAPP statute. (*Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 67.) Here, however, Six4Three does not challenge defendants' showing on this initial burden. Instead, Six4Three argues that the trial court erred in rejecting application of the "commercial speech" exception to defendants' asserted protected activity.

Section 425.17, subdivision (c) provides that the anti-SLAPP statute "does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services . . . arising from any statement or conduct by that person" if certain conditions exist. The party seeking the benefit of this exception—here, Six4Three—bears the burden to show its applicability. (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 23 (*Simpson Strong-Tie*).)

### B. Analysis

In 2013, the Legislature enacted section 425.17 to exempt certain actions from the anti-SLAPP statute, in light of concerns with "a disturbing abuse" of the law. (§ 425.17, subd. (a).)

The commercial speech exception has four elements: "(1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in

13

the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17(c)(2)."[3]  (*Simpson Strong-Tie*, *supra*, 49 Cal.4th at p. 30.)  "We review the applicability of the commercial speech exemption independently."  (*Id.* at p. 26.)  And because section 425.17 is a statutory exception, it " 'should be narrowly construed.' "  (*Simpson Strong-Tie*, at p. 22.)

### 1.  The Parties' Preliminary Contentions

Six4Three asserts that the trial court erred by requiring Six4Three to present evidence of the elements of the commercial speech exception, rather than allowing Six4Three to rely on its allegations.  We disagree.  *Simpson Strong-Tie* makes clear that Six4Three has the burden to *prove*, not just allege, applicability of the commercial speech exception.  (*Simpson Strong-Tie*, *supra*, 49 Cal.4th at p. 23.)  The California Supreme Court explained that because the commercial speech exception is "essential" to opposing an anti-SLAPP motion, Evidence Code section 500 places on plaintiff the burden of proving the applicability of the exception.[4]  (*Simpson Strong-Tie*, at p. 24; see also *Rivera v. First DataBank, Inc.* (2010) 187 Cal.App.4th 709, 718 [concluding that plaintiffs had not met their burden to demonstrate commercial

---

[3] Section 425.17, subdivision (c)(2) defines "intended audience" to include "an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer."

[4] Evidence Code section 500 provides that "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."

14

speech exception as they had "presented no evidence to support this claim and a mere allegation does not suffice"].)

None of the cases on which Six4Three relies supports a contrary conclusion. Those cases simply confirm that the commercial speech exception relates to whether activity is protected (the first anti-SLAPP step), and not whether a plaintiff is likely to prevail on the merits of its claims (the second anti-SLAPP step). (*Neurelis, Inc. v. Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769, 786; *JAMS, Inc. v. Superior Court* (2016) 1 Cal.App.5th 984, 993 (*JAMS*).) And although the appellate court in *Xu v. Huang* (2021) 73 Cal.App.5th 802, 815–816, considered some allegations in analyzing the third element of the commercial speech exception (purpose of the statement or conduct), that decision does not undermine the California Supreme Court's direction that Six4Three bears the burden of establishing the four elements with evidence, not allegations alone. (*Simpson Strong-Tie, supra*, 49 Cal.4th at p. 26.)

Facebook, for its part, attempts to characterize the commercial speech exception as a "comparative advertising" exception. In *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 147 (*FilmOn*), the California Supreme Court stated that section 425.17, subdivision (c) "exempts 'only a subset of commercial speech'—specifically, comparative advertising." But in *FilmOn,* the parties agreed that the speech at issue did not fall within 425.17, subdivision (c) and in commenting on the commercial speech exception, the court was simply clarifying that not all "commercially oriented statements" fall within section

15

425.17, subdivision (c) (and therefore outside the reach of the anti-SLAPP statute). (*FilmOn*, at pp. 147–148 & fn. 4.) Rather than narrowing application of the exception to the single context of comparative advertising, given "the Legislature's decision to explicitly require consideration of certain contextual factors—like speaker, audience, and purpose," application of the exception should be directed by its four statutory elements. (*Id.* at p. 148; *Neurelis, Inc. v. Aquestive Therapeutics, Inc.*, *supra*, 71 Cal.App.5th at pp. 787–788 & fn. 5 [rejecting argument that commercial speech exception applies only to comparative advertising and noting that *FilmOn* "was not considering whether certain speech fell under subdivision (c)" when it mentioned comparative advertising in the context of "interpreting the 'catchall' provision of section 425.16, subdivision (e)(4)"].) We therefore reject Facebook's "comparative advertising" gloss on the commercial speech exception and instead, in subsequent sections of this opinion, focus on the elements of the exception as set forth in *Simpson Strong-Tie*, *supra*, 49 Cal.4th at page 30.

We do, however, agree with Facebook's preliminary contention that Six4Three has forfeited any argument that evidence regarding *Facebook's* business can be imputed to the *individual defendants* for the purpose of establishing the elements of the commercial speech exception as to these individuals. Six4Three failed to include any such argument or authority in its opening appellate brief, instead including a single conclusory sentence that the evidence and arguments as to Facebook "fully apply" to the individual defendants. (Cal. Rules

16

of Court, rule 8.204(a)(1)(B) [each brief must support each point with argument and, if possible, citation of authority]; *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 844, fn. 3 [contentions in opening appellate brief forfeited for failure to present argument and appropriate legal authorities].)

While the plain text of section 425.17, subdivision (c) makes clear that the commercial speech exception can apply to an individual "person," not just a business entity, it also requires that the commercial speech be "*about that person's* or a business competitor's *business*." (*Id.*, subd. (c)(1), italics added.) Six4Three has not presented any argument or authority that Facebook should be treated as each of the individual defendants' own business here. (Cf. *FilmOn*, *supra*, 7 Cal.5th at p. 147, fn. 4 [no commercial speech exception where defendant had not made any representations about its own business or a competitor]; *Simpson Strong-Tie*, *supra*, 49 Cal.4th at p. 32 [same]; *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 676 [same].)

In any event, even if Six4Three had not forfeited the argument, we are not persuaded that the commercial speech exception is applicable to the individual defendants based on Six4Three's showing as to Facebook because, as explained below, we conclude that Six4Three failed to meet its burden on the second element of the exception. Because failure on this element is dispositive, we need not address the other elements of the exception.

17

## 2. Element Two -- Representations of Fact

The second element of the commercial speech exception required Six4Three to demonstrate that its causes of action "aris[e] from" statements or conduct that consist of "representations of fact" about Facebook's business operations or services. (§ 425.17, subd. (c)(1).) Six4Three argues that its claims are based on representations of fact by Facebook regarding access it "purported to provide" developers for building apps that used Facebook data. The fourth amended complaint, for example, points to the Facebook Platform announcement that offered " 'access to deep integration' into the site."

We agree that these are representations of fact about Facebook's business, but the remaining question is whether Six4Three has demonstrated that each of its claims "aris[es] from" such representations. (§ 425.17, subd. (c)(1).)

This question focuses on whether a defendant's activity " 'gives rise to his or her asserted liability.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063, quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 92.) As the California Supreme Court has explained, the only means to satisfy this "arising from" requirement is " 'to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the [statutory] categories.' " (*Park*, at p. 1063.) Our Supreme Court has applied this principle to the "arising from" language in section 425.17, subdivision (c). (See *Simpson Strong-Tie*, *supra*, 49 Cal.4th at p. 30 [claims alleging liability and harm based on statements in lawyer advertisement

18

"impl[ying] that [plaintiff's products] are defective" and stating that a lawyer would investigate potential claims do not satisfy "arising from" requirement for commercial speech exception].)

Here, Six4Three repeatedly alleged that Facebook engaged in a "bait-and-switch" scheme—initially providing developer access to Facebook data, and later restricting that access—but its allegations of liability and harm rely solely on the "switch" part of any such scheme. Six4Three's injury thus arises not from the above-described factual representations about Facebook's business, but on Facebook's later conduct in restricting access to certain data. On its UCL cause of action, for example, Six4Three alleged that Facebook caused it substantial harm "when it decided to terminate Developers' ability to build advanced photo-searching applications." Six4Three alleged that Facebook was liable for breach of contract and at least $25,000 in harm because it breached its purported agreement to provide developer access to data. And on its concealment claim, Six4Three alleged that Facebook did not disclose its decision to restrict such access and Six4Three was injured by continuing to invest in its business. None of this alleged injury-producing conduct—restriction of access, internal decision-making to restrict access, or concealment of that decision—constitutes a "representation of fact" about Facebook's business.

In its appellate briefing, Six4Three relied exclusively on *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294 (*Demetriades*) to argue otherwise. That case involved a restaurant operator who sued Yelp based on its allegedly false

19

and misleading statements about its proprietary filter for customer reviews:  that the filter gave consumers " 'the most trusted reviews,' " that it was " 'remarkable' " because it " 'takes the reviews that are the most trustworthy' " and " 'keeps the less trustworthy reviews out,' " and that Yelp was doing " 'as good a job as possible' " to show " 'the most trustworthy and useful content out there.' "  (*Id.* at pp. 298–301.)

The restaurant operator alleged that these statements were misleading or untrue because Yelp's filter in fact suppressed trustworthy reviews and did not filter out the untrustworthy ones, and thus its filter failed to do what Yelp had represented it could do.  (*Demetriades*, *supra*, 228 Cal.App.4th at pp. 299, 301.)  *Demetriades* correctly concluded that these claims arose from "representations of fact" about Yelp's business.  (*Id.* at p. 311.)  But those representations were "bait" statements—there was no subsequent "switch" by Yelp.  Here, unlike *Demetriades*, Six4Three's claims were not based on alleged "bait" misrepresentations about the contemporaneous accuracy or accessibility of Facebook's data, but on the purported "switch":  Facebook's later decision to restrict access to its users' data.

At oral argument, Six4Three cited *JAMS* for its position that a representation of fact need not be "an affirmative or positive representation," but can also be "an omission or half-truth."  (*JAMS*, *supra*, 1 Cal.App.5th at p. 995.)  Regardless of how Six4Three attempts to characterize the alleged representations of fact here, it has still failed to demonstrate that

20

its causes of action *arise from* such representations.  (§ 425.17, subd. (c)(1).)

Moreover, the representations of fact at issue in *JAMS* are a far cry from those alleged by Six4Three here.  In that case, the plaintiff sued JAMS for deceptive representations made on its website in the biography of a private judge and in the description of its neutrals as having the " ' "highest ethical and moral standards" ' " and being " ' "dedicated to neutrality, integrity, honesty." ' " (*JAMS*, *supra*, 1 Cal.App.5th at p. 991.)  The appellate court concluded that these were representations of fact because "they are specific statements representing how JAMS conducts its operations with neutrality, integrity, honesty and accountability." (*Id.* at p. 995.)

Here, unlike *JAMS*, the fourth amended complaint recited statements and conduct by Facebook not for their allegedly false factual assertions, but for what they allegedly promised about the future.  It alleged, for example, that Facebook's Platform announcement in 2007 promised that developers "would have access to the 'social graph.' "  It also alleged that Facebook's creation of a fund for developers in 2007 "implies a specific promise that it will support developers' opportunity to 'build a compelling business on Facebook Platform' and that it is committed long-term to the stability of Facebook Platform."  But as the California Supreme Court has explained, a "promise" of what a party will do " 'is not a representation of fact, but an agreement to take certain actions in the future' " and thus does

21

not satisfy the second element of the commercial speech exception.  (*Simpson Strong-Tie*, *supra*, 49 Cal.4th at p. 31.)

Nor are we persuaded by any argument that Six4Three's claims arise from a representation of fact by Facebook that was an "omission" or "half-truth."  (*JAMS*, *supra*, 1 Cal.App.5th at p. 995.)  Again, the fourth amended complaint alleged that Facebook made various statements in 2007 regarding developer access to Facebook Platform.  It alleged that Facebook released a document in 2009 describing "success stories" of applications developed on Facebook Platform.  Then, in 2010, Facebook's Graph API permitted developers to build apps that could access Facebook data from not only users who downloaded the app, but also from those users' friends.  Six4Three also alleged that Zuckerberg made certain statements in 2011 regarding the graph and developer access.

But nothing in the fourth amended complaint suggests that these representations about developer access were omissions or half-truths when made.  On the contrary, Six4Three relied on this access to develop Pikinis in 2012.  Between that time and Facebook's decision in 2015 to restrict such access, the fourth amended complaint alleges that Facebook had *internal* discussions and meetings about the restriction.  Six4Three has not alleged, let alone proven, any representations of fact that satisfy this element.

In sum, Six4Three has failed to meet its burden to show its claims arose from representations of fact about Facebook's business operations or services.  (§ 425.17, subd. (c)(1).)  Because

Six4Three cannot demonstrate applicability of the commercial speech exception, we conclude that the trial court did not err in finding that Facebook satisfied the first step of the anti-SLAPP analysis. We turn next to the second step.

## III. Anti-SLAPP Second Step: Probability of Prevailing on Claims

### A. Additional background

The second step of the anti-SLAPP analysis required Six4Three to demonstrate a probability of prevailing on its claims in the fourth (as to Facebook) and fifth (as to the individual defendants) amended complaints. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.)

Defendants first argue that Six4Three was unable to meet this burden because its claims were barred by the Communications Decency Act (47 U.S.C. § 230) (Section 230). Section 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." As relevant here, section 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

Defendants alternatively argue that, even if section 230 did not bar the claims against them, Six4Three nonetheless failed to show a probability of prevailing on those claims. Six4Three's breach of contract cause of action against Facebook, for example, was based on the 2012 SRR.

23

Section 9 of the 2012 SRR is titled "Special Provisions Applicable to Developers/Operators of Applications and Websites." It begins: "If you are a developer or operator of a Platform application or website, the following additional terms apply to you." It continues: "Your access to and use of data you receive from Facebook, will be limited as follows." It lists ten provisions, one of which states: "We can limit your access to data." Section 9 next includes various limitations regarding user content, customer support, and third party advertising. It then states: "We give you all rights necessary to use the code, APIs, data, and tools you receive from us." Section 14 of the 2012 SRR is titled "Amendments." It provides: "Your continued use of Facebook following changes to our terms constitutes your acceptance of our amended terms."

Facebook revised its SRR in January 2015. It no longer included the above provisions for developers and operators of the Facebook Platform. It did, however, contain similar language regarding amendments to the SRR, stating: "Your continued use of Facebook Services, following notice of the changes to our terms, policies or guidelines, constitutes your acceptance of our amended terms, policies or guidelines."

### B. Analysis

We independently review the trial court's ruling on the second step of the anti-SLAPP framework. (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699.) Our determination follows a "summary-judgment-like procedure," where we consider the pleadings as well as supporting and

24

opposing affidavits stating the facts upon which the liability or defense is based.  (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192; § 425.16, subd. (b)(2).)  "We do not weigh credibility, nor do we evaluate the weight of the evidence.  Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." (*Overstock.com, Inc.*, at pp. 699–700.)

While plaintiffs need only show a " 'minimum level of legal sufficiency and triability,' " they must demonstrate that each claim is both legally sufficient and supported by a sufficient prima facie showing made with competent and admissible evidence.  (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 469.)  Plaintiffs must also overcome any "substantive defenses" to their claim. (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 953.)  We begin with one such asserted defense:  Facebook's argument that section 230 bars Six4Three's claims.

### 1. Section 230

" 'Congress enacted section 230 "for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." ' "  (*Murphy v. Twitter, Inc.* (2021) 60 Cal.App.5th 12, 24 (*Murphy*), quoting *Hassell v. Bird* (2018) 5 Cal.5th 522, 534 (*Hassell*).)  "The statute contains express findings and policy declarations recognizing the rapid growth of the Internet, the beneficial effect of minimal government

25

regulation on its expansion, and the twin policy goals of 'promot[ing] the continued development of the Internet and other interactive computer services' and 'preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.' " (*Murphy*, at p. 24.)

The California Supreme Court, California appellate courts, and federal courts have generally interpreted section 230 to confer "broad immunity" for providers who "use the Internet to publish information that originated from another source." (E.g., *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39; *Murphy*, *supra*, 60 Cal.App.5th at p. 17 ["Under § 230, interactive computer service providers have broad immunity from liability for traditional editorial functions undertaken by publishers—such as decisions whether to publish, withdraw, postpone or alter content created by third parties"]; *Carafano v. Metrosplash.com, Inc.* (9th Cir. 2003) 339 F.3d 1119, 1123 [describing section 230 immunity as "quite robust"].)

The three elements required to establish section 230 applicability are "(1) the defendant be a provider or user of an interactive computer service; (2) the cause of action treat the defendant as a publisher or speaker of information; and (3) the information at issue be provided by another information content provider." (*Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 830.) There is no dispute on the first element: Facebook is an "interactive computer service" provider.

On the second element, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." (*Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096, 1102 (*Barnes*).) "To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." (*Barnes*, at p. 1102.)

We agree with Six4Three that section 230 does not bar its breach of contract claim because that claim is not based on any duty derived from Facebook's status or conduct as a publisher or speaker, but instead on an alleged duty owed under the 2012 SRR. (See *Calise v. Meta Platforms, Inc.* (9th Cir. 2024) 103 F.4th 732, 743 [declining to apply section 230 to contract claims because "Meta's '[c]ontract liability' would 'come not from [its] publishing conduct, but from [its] manifest intention to be legally obligated to do something' "].)

We conclude, however, that Six4Three's remaining claims inherently rest on Facebook's status or conduct as a publisher of information. As detailed above, defendants' purported liability under each cause of action is based on the decision to remove developer access to certain user content, which as the trial court explained, is "akin to the act of de-publishing."

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.* (N.D.Cal. 2015) 144 F.Supp.3d 1088 (*Sikhs for Justice*) is instructive on the point. In that case, the plaintiff alleged that access to its Facebook page had been blocked in India and that Facebook had

27

acted " 'on its own or on the behest of the Government of India' " because of discrimination against the organization and its members. (*Id.* at p. 1090.) Facebook argued that the plaintiff's discrimination claim was barred by section 230. (*Sikhs for Justice*, at p. 1092.) In determining whether the claim treated Facebook as a publisher, the court relied heavily on *Barnes*. (*Sikhs for Justice*, at pp. 1094–1096.)

" '[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.' " (*Sikhs for Justice*, *supra*, 144 F.Supp.3d at p. 1094, quoting *Barnes*, *supra*, 570 F.3d at p. 1102.) And " 'removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher.' " (*Sikhs for Justice*, at p. 1095, quoting *Barnes*, at p. 1103.) Accordingly, section 230 protects from liability " 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online.' " (*Sikhs for Justice*, at p. 1096, quoting *Barnes*, at p. 1103.) The court noted that the plaintiff had sought an injunction requiring Facebook to restore access to its page in India. (*Sikhs for Justice*, at p. 1096; see also *Hassell*, *supra*, 5 Cal.5th at p. 544 [section 230 "conveys an intent to shield Internet intermediaries from the burdens associated with defending against state law claims that treat them as the publisher or speaker of third party content, and from compelled compliance with demands for relief that, when viewed in the context of a plaintiff's allegations, similarly assign them the legal

28

role and responsibilities of a publisher *qua* publisher"].) The court concluded that the discrimination claim was barred because Facebook's blocking of access to the page in India constituted "publisher conduct immunized by [section 230]." (*Sikhs for Justice*, at pp. 1095–1096.)

Like *Sikhs for Justice*, Six4Three's claims here challenge Facebook's decision to restrict the scope of access to Graph API data—not block access for all or delete the data entirely. And as in *Sikhs for Justice*, Six4Three sought a permanent injunction requiring Facebook to expand access to content; specifically, Six4Three sought an order "requiring Facebook to restore Developer access to the Graph API data, including reading the full friends list, friends permissions and newsfeed APIs, and all other data and APIs available prior to Facebook's removal of the data on April 30, 2015." Six4Three's non-contract claims, as exemplified by its allegations challenging Facebook's decision to restrict Graph API data access and its related demands for relief, treat Facebook as a publisher.

Six4Three attempts to suggest that there is an inherent inconsistency with any treatment of Facebook as the *speaker* of statements regarding its provision of developer access, but then as the *publisher* of information from users when it restricted such access. But this framework is entirely consistent with the nature of the claims Six4Three has alleged here: that Facebook engaged in a "bait-and-switch" scheme because it initially promised access (as a speaker), and then restricted that access (as a publisher). Six4Three's citation to *Demetriades* is not on point because, as

29

explained above, it involved only "bait" statements by Yelp and no subsequent "switch." (*Demetriades*, *supra*, 228 Cal.App.4th at p. 313.)

Six4Three also attempts to distinguish cases applying section 230 to claims brought by *users* challenging Facebook's decisions to block (or not block) access to certain user content. (*Cross v. Facebook, Inc.* (2017) 14 Cal.App.5th 190, 200 ["the clear gravamen of [the complaint] is Knight's objection to the third party content on the pages and Facebook's editorial decisions to not remove them"]; *Sikhs for Justice*, *supra*, 144 F.Supp.3d at p. 1095.) But Six4Three offers no basis for us to disregard the general language of section 230 and its broad interpretation by courts, and instead adopt some narrower rule that section 230 is inapplicable to claims by a *developer* challenging a publisher's decision to block access to certain user content. (*Hassell*, *supra*, 5 Cal.5th at p. 544; *Murphy*, *supra*, 60 Cal.App.5th at p. 17.)

Turning to the third element of section 230 immunity, we conclude that the information at issue was provided by another content provider: Facebook users. As Six4Three alleged, Pikinis enabled its users to search through photos posted by Facebook users. The app "could only access and display photos that Facebook users had chosen to share."

We are not persuaded by Six4Three's citation to authority declining to apply section 230 where the interactive computer service provider had created the content at issue. In *Fair Housing Coun., San Fernando v. Roommates.com* (9th Cir. 2008) 521 F.3d 1157, the plaintiffs sued a website operator because it

required subscribers to answer a series of questions that allegedly violated housing discrimination laws. (*Id.* at pp. 1161–1162.) In *Lemmon v. Snap, Inc.* (9th Cir. 2021) 995 F.3d 1085, the plaintiffs sued Snapchat alleging that it was negligent in designing its smartphone application to record the moving speed of users. (*Id.* at p. 1087.) And in *Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910, the plaintiff alleged that Facebook's advertising tools required the setting of certain parameters that discriminated against women and older people. (*Id.* at p. 918.) Here, unlike these cases, the content at issue is content that originated from Facebook users.

We conclude that the trial court did not err in finding section 230 applicable to Six4Three's non-contract causes of action, thus establishing that Six4Three failed to show a probability of prevailing on these claims. We now turn to its contractual claim.

### 2. Breach of Contract Claim

Six4Three argues that it demonstrated a probability of prevailing on its breach of contract claim through the 2012 SRR. But Six4Three cherry-picks a single phrase from Section 9 of those terms—that Facebook would give it "all rights necessary to use the code, APIs, data, and tools you receive from us"—to contend that Facebook promised Six4Three access to Facebook's code, APIs, data, and tools in perpetuity.

In so doing, Six4Three ignores language in the immediately preceding lines that limited developer access and explicitly stated that Facebook "can limit your access to data." (Cf. Civ. Code,

31

§ 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].) Six4Three also ignores the 2015 SRR, which was in place before Facebook restricted Six4Three's access to Graph API data and did not contain the phrase on which Six4Three now relies. (*Cf. id.,* § 1698, subd. (a) ["A contract in writing may be modified by a contract in writing"].) Six4Three offers no argument or authority to disregard the explicit limiting language of the 2012 SRR or the amendments reflected in the 2015 SRR. Six4Three thus has not shown a probability of prevailing on its breach of contract claim.

In sum, given our conclusions regarding section 230 and the contractual cause of action, we conclude that the trial court did not err in finding Six4Three had failed its burden on the second anti-SLAPP step.

## IV. Discovery Motion

### A. Additional background

Section 425.16, subdivision (g) provides, in relevant part, that discovery proceedings are generally stayed by the filing of an anti-SLAPP motion but "[t]he court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision."

While Facebook's anti-SLAPP motion was pending, Six4Three filed a discovery motion seeking to take two depositions and obtain documents responsive to several dozen requests for production it had propounded before the anti-SLAPP motion was filed. It argued that "good cause" existed because the

anti-SLAPP motion sought to strike all of its claims, and it would be "entirely prejudicial" for Six4Three to oppose the motion without "first reviewing" this discovery previously requested.

By the time of the hearing, the parties had already received the trial court's tentative ruling on Facebook's anti-SLAPP motion. Six4Three's counsel noted that the tentative found Six4Three had not sufficiently demonstrated the commercial speech exception or opposed application of section 230. Counsel stated: "Now, we think that, look, either there's an absence of evidence on this or there isn't, but either way the evidence that we have sought is, in fact, directly pertinent towards areas that this Court has said were lighter . . . [and] would've helped you fill that specific evidentiary, or lack that the Court has stated is missing."

The trial court denied the discovery motion. As a preliminary matter, it found that Six4Three had contradicted any need for such discovery by claiming in its papers that it had sufficient evidence to defeat Facebook's anti-SLAPP motion. The court also found that Six4Three had not sufficiently stated why the discovery was necessary, instead arguing that "ongoing discovery was 'disrupted by the filing of' that motion."

### B. Analysis

We review the trial court's ruling on Six4Three's discovery motion for abuse of discretion. (*Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 191 ["We may not disturb the trial court's ruling on such a discovery request absent an abuse of discretion"].)

33

Six4Three contends that it showed "good cause" under section 425.16, subdivision (g) because its counsel made "very clear" at the hearing "what specific, limited discovery was needed in connection with the not-yet-decided Facebook anti-SLAPP motion if the court were to follow its tentative from the Individual Defendants anti-SLAPP."

To satisfy this "good cause" standard, a party must *explain what additional facts* [*it*] *expects to uncover*" and why the discovery is necessary to carry its burden on the anti-SLAPP motion.  (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 247, italics added.)  Conclusory comments by counsel that the evidence requested—including two depositions and responses to dozens of requests for production—would somehow "fill" unspecified evidentiary gaps was not a sufficient explanation.

We conclude that the trial court did not abuse its discretion in denying Six4Three's discovery motion.

## V. Attorney Fee Award

### A. Additional background

Defendants' anti-SLAPP motions included a request for attorney fees under section 425.16, subdivision (c) as the prevailing parties on the motions.  After the trial court granted the anti-SLAPP motions, defendants sought a $2.9 million lodestar for over 5,000 attorney hours.

Six4Three did not oppose the request in its entirety, but instead argued that the amount should be approximately $357,000.  Six4Three argued that defendants' proposed lodestar

34

included work not "directly pertinent" to the anti-SLAPP motions, such as fees incurred for the prior appeal.

The trial court concluded that an award of $683,417.50 in attorney fees was reasonable "in light of the lengthy procedural history on Defendants' anti-SLAPP motions." At the hearing, the court explained that this amount included "appellate work related to the anti-SLAPP motion" and the "motions to seal portions of the corresponding papers."

### *B. Analysis*

Section 425.16, subdivision (c)(1) provides that "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs." Such entitlement includes fees and costs " ' "incurred in connection with" ' " the anti-SLAPP motion itself, but not "fees and costs incurred for the *entire* action." (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 433 (*569 East County*).) We review the trial court's determination regarding the amount of such fees for abuse of discretion. (*Ibid.*)

Six4Three argues, without citation to supporting authority, that the trial court abused its discretion here because it "declined to excise time billed for, among other things, Defendants' unsuccessful anti-SLAPP appeals and sealing motions." But, as detailed above, the prior appeal led to the granting of the individual defendants' anti-SLAPP motion, which led to the reconsideration (and ultimate granting) of Facebook's anti-SLAPP motion. And Facebook's motions to seal included

35

requests to seal briefing, declarations, and evidence submitted by Six4Three in opposition to the anti-SLAPP motion. The trial court granted many of these requests, noting that the material contained confidential or competitively sensitive information regarding Facebook's business strategies and objectives. Work related to both the prior appeal and sealing motions thus constituted " ' "expenses incurred *in extracting* [defendants] from a baseless lawsuit," ' " which the fees provision of the anti-SLAPP statute is designed to reimburse. (*569 East County*, *supra*, 6 Cal.App.5th at p. 433.)

We conclude Six4Three has failed to show the trial court abused its discretion in awarding defendants $683,417.50 in attorney fees.

## DISPOSITION

The June 20, 2022 orders granting defendants' anti-SLAPP motions and the February 17, 2023 attorney fees order are affirmed. Defendants are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

BROWN, P. J.

WE CONCUR:

GOLDMAN, J.
SIMONDS, J.*

---

\* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

Trial Court:      Superior Court of California, County of
San Mateo

Trial Judge:      Hon. Robert D. Foiles

Counsel:      Bathaee Dunne, Yavar Bathaee and Brian J.
Dunne, for Plaintiff and Appellant.

Wilmer Cutler Pickering Hale and Dorr, Sonal
N. Mehta and Ari Holzblatt, for Defendants
and Respondents.